No. 23-2086

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

REGENERON PHARMACEUTICALS, INC.,

Defendant-Appellee.

————————————

On Appeal from the United States District Court
for the District of Massachusetts

————————————

**BRIEF FOR APPELLANT**

————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

JOSHUA S. LEVY
  *Acting United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
DANIEL WINIK
  *Attorneys, Appellate Staff
  Civil Division, Room 7245
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC 20530
  (202) 305-8849*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................ii

STATEMENT REGARDING ORAL ARGUMENT ....................................................vi

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF THE ISSUE ..............................................................................1

STATEMENT OF THE CASE ................................................................................1

    A.    Statutory Background....................................................................1

    B.    This Litigation ............................................................................3

SUMMARY OF ARGUMENT ................................................................................8

STANDARD OF REVIEW....................................................................................10

ARGUMENT .....................................................................................................11

THE DISTRICT COURT ERRED IN REQUIRING PROOF THAT EYLEA CLAIMS
    WOULD NOT HAVE BEEN SUBMITTED BUT FOR REGENERON'S
    KICKBACKS...............................................................................................11

    A.    If Kickbacks Are Given To Induce The Purchase Of Items,
        Claims For Those Items Are False Under § 1320a-7b(g) .........11

    B.    The District Court's Contrary Reasoning Is Unpersuasive ......19

    C.    This Court Should Vacate The Denial Of The Government's
        Motion For Partial Summary Judgment And Remand For Further
        Proceedings ...............................................................................31

CONCLUSION .................................................................................................32

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                             **Page(s)**

*Burrage v. United States,*
571 U.S. 204 (2014) ...................................................................9, 19, 20, 22, 24

*Guilfoile v. Shields,*
913 F.3d 178 (1st Cir. 2019)........................................7, 8, 9, 14, 15, 17, 18, 23

*Kuzma v. Northern Arizona Healthcare Corp.,*
607 F. Supp. 3d 942 (D. Ariz. 2022)..................................................................18

*McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.,*
423 F.3d 1256 (11th Cir. 2005) .................................................................... 2, 12

*Paroline v. United States,*
572 U.S. 434 (2014) ..............................................................................9, 20, 24

*Pugin v. Garland,*
599 U.S. 600 (2023) ..........................................................................................23

*Thiersaint v. Department of Homeland Security,*
85 F.4th 653 (1st Cir. 2023) .............................................................................10

*United States v. Medtronic, Inc.,*
2021 WL 4168140 (D. Kan. Sept. 14, 2021) ....................................................18

*United States v. Rogan,*
517 F.3d 449 (7th Cir. 2008) ...................................................................... 22, 23

*United States v. Saemisch,*
70 F.4th 1 (1st Cir. 2023)............................................................................20-21

*United States v. Teva Pharmaceuticals USA, Inc.,*
2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) ............................................ 18, 26

*United States v. Teva Pharmaceuticals USA, Inc.,*
__ F. Supp. 3d __, 2023 WL 4565105 (D. Mass. July 14, 2023) ...................18

*United States ex rel. Bawduniak v. Biogen Idec, Inc.*,
    2018 WL 1996829 (D. Mass. Apr. 27, 2018) ........................................................ 6, 7, 17

*United States ex rel. Cairns v. D.S. Medical LLC*,
    42 F.4th 828 (8th Cir. 2022) ........................................................................... 6, 19

*United States ex rel. Fesenmaier v. Cameron-Ehlen Group, Inc.*,
    2023 WL 36174 (D. Minn. Jan. 4, 2023) ............................................................... 12

*United States ex rel. Fitzer v. Allergan, Inc.*,
    2022 WL 3599139 (D. Md. Aug. 23, 2022) ...................................... 18, 20, 22, 23

*United States ex rel. Greenfield v. Medco Health Solutions, Inc.*,
    880 F.3d 89 (3d Cir. 2018) ..................................................... 7, 15, 16, 22, 26

*United States ex rel. Heller v. Guardian Pharmacy of Atlanta, LLC*,
    2024 WL 102211 (N.D. Ga. Jan. 9, 2024) ............................................................ 12

*United States ex rel. Hutcheson v. Blackstone Medical, Inc.*,
    647 F.3d 377 (1st Cir. 2011) ................................................. 2, 7, 11-12, 13, 30

*United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*,
    41 F. Supp. 3d 323 (S.D.N.Y. 2014) ..................................... 3, 14, 18, 19, 23

*United States ex rel. Louderback v. Sunovion Pharmaceuticals, Inc.*,
    2023 WL 8188879 (D. Minn. Nov. 27, 2023) ..................................................... 12

*United States ex rel. Martin v. Hathaway*,
    63 F.4th 1043 (6th Cir. 2023) ..................................................................... 6, 19, 24

*United States ex rel. Parikh v. Citizens Medical Center*,
    977 F. Supp. 2d 654 (S.D. Tex. 2013) ............................................................. 11, 21

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) ..................................................................................... 21

*United States ex rel. Thomas v. Bailey*,
    2008 WL 4853630 (E.D. Ark. Nov. 6, 2008) ................................................ 3, 14

*United States ex rel. Westmoreland v. Amgen, Inc.*,
    812 F. Supp. 2d 39 (D. Mass. 2011) .................................................................. 12

*United States ex rel. Wilkins v. United Health Group, Inc.*,
659 F.3d 295 (3d Cir. 2011) ...................................................................12, 23, 26

*Universal Health Services, Inc. v. United States*,
579 U.S. 176 (2016) ........................................................................... 2, 14

**Statutes:**

Inflation Reduction Act of 2022,
Pub. L. No. 117-169, tit. I, subtitle B, pt. 2, § 11101, 136 Stat. 1818, 1865-1871 .......4

28 U.S.C. § 1292(b) ..........................................................................1

28 U.S.C. § 1345 .............................................................................1

28 U.S.C. § 1367 .............................................................................1

31 U.S.C. § 3729(a)(1) ......................................................................29

31 U.S.C. § 3729(a)(1)(A) ....................................................................2

31 U.S.C. § 3729(a)(1)(B) ....................................................................2

31 U.S.C. § 3729(b) ........................................................................29

42 U.S.C. § 1320a-7a .........................................................................3

42 U.S.C. § 1320a-7b(b) .....................................................................24

42 U.S.C. § 1320a-7b(b)(1) ..................................................................11

42 U.S.C. § 1320a-7b(b)(2) .................................1, 2, 6, 10, 11, 21, 22, 25

42 U.S.C. § 1320a-7b(g) .....................................1, 3, 8, 10, 15, 25

42 U.S.C. § 1395*l*(a)(1) .....................................................................4

**Legislative Materials:**

155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009)............................. 3, 14, 18, 19

155 Cong. Rec. S10,854 (daily ed. Oct. 28, 2009)........................................... 3, 19

H.R. Rep. No. 95-393 (1977)..............................................................................26

**STATEMENT REGARDING ORAL ARGUMENT**

The question presented is significant and has divided district courts within the Circuit. Oral argument is warranted given the importance of the issue and the need for clear guidance from this Court. This case should be argued together with *United States v. Teva Pharmaceuticals USA, Inc.*, No. 23-1958, and *United States ex rel. Flanagan v. Fresenius Medical Care Holdings, Inc.*, No. 23-1305, which involve related issues.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this False Claims Act suit, and an associated unjust-enrichment claim, under 28 U.S.C. §§ 1345 and 1367. The district court certified its summary-judgment ruling for interlocutory appeal under 28 U.S.C. § 1292(b), JA1299-1301, and this Court granted the government's petition for permission to appeal, No. 23-8036. This Court accordingly has jurisdiction under § 1292(b).

## STATEMENT OF THE ISSUE

This is an action under the False Claims Act (FCA) based on alleged violations of the Anti-Kickback Statute (AKS). As relevant here, the AKS forbids kickbacks meant "to induce" purchases of federally reimbursable medications. 42 U.S.C. § 1320a-7b(b)(2). The AKS states that a claim seeking reimbursement from a federal healthcare program is "false or fraudulent … for purposes of" the FCA if it "includes items or services resulting from a violation of" the AKS. *Id.* § 1320a-7b(g).

The question presented is whether the government can establish that a claim is false under that provision by showing that the claim seeks reimbursement for items that a kickback was given to induce, or whether the government must also prove that the items would not have been provided but for the kickback.

## STATEMENT OF THE CASE

### A.    Statutory Background

As relevant here, the AKS imposes criminal liability on anyone who "knowingly and willfully offers or pays any remuneration … to any person to induce such person[]

… to purchase, lease, order … or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

Courts have long recognized that AKS compliance "is a precondition" of reimbursement from federal healthcare programs like Medicare and Medicaid. *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 392 (1st Cir. 2011). An AKS violation therefore can give rise to liability under the FCA. As relevant here, the FCA imposes civil liability for "knowingly present[ing] or caus[ing] to be presented" to the federal government "a false or fraudulent claim for payment," or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). If a provider expressly but falsely certifies in requesting payment from a federal healthcare program that it has complied with the AKS, the certification is actionable as a "false record or statement" material to the provider's claim. *Id.* § 3729(a)(1)(B). Even without an express certification, moreover, a provider can be liable under the FCA where it "makes specific representations about the goods or services provided" but "fail[s] to disclose noncompliance with material statutory, regulatory, or contractual requirements" in a way that "makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 190 (2016). This Court accepted such an implied-false-certification theory based on an AKS violation in *Hutcheson*. 647 F.3d at 392-394; *see also, e.g.*, *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005) (similar).

In 2010, Congress amended the AKS to add an additional way of establishing FCA liability for AKS violations. The amendment, codified at 42 U.S.C. § 1320a-7b(g), states that "[i]n addition to" the AKS's criminal penalties and related civil remedies, *see* 42 U.S.C. § 1320a-7a, any "claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA. A sponsor of the amendment explained that it was meant to "strengthen[] whistleblower actions based on medical care kickbacks," including by overruling *United States ex rel. Thomas v. Bailey*, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008), which had concluded that a hospital's reimbursement claims for surgeries were not false, even though a manufacturer had violated the AKS by paying a surgeon to use its products in those surgeries, because the hospital had not itself violated the AKS or been aware of the violation. 155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (Sen. Kaufman). The amendment would make clear, the sponsor explained, "that all claims *resulting from* illegal kickbacks are 'false or fraudulent,' even when the claims are not submitted directly by the wrongdoers themselves." *Id.* (emphasis added); *see id.* at S10,854 (Sen. Leahy, making the same point); *United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 333-335 (S.D.N.Y. 2014) (discussing this legislative history).

### B. This Litigation

In this case, the government alleges that Regeneron Pharmaceuticals, Inc. violated the AKS by covering the costs of expensive copayments for a Regeneron drug with the purpose of inducing purchases of that drug.

1.	Medicare Part B covers outpatient medical services and physician-administered drugs.  Like most health-insurance plans, Part B incorporates a cost-sharing requirement.  Generally, Medicare will cover 80% of the cost of physician-administered drugs, with beneficiaries left to cover the remaining 20% unless they purchase separate coverage for it.  42 U.S.C. § 1395*l*(a)(1); *see* JA42.[1]  Like all coinsurance requirements, the Part B coinsurance requirement serves to internalize for patients some of the cost of choosing a particular drug.  By making patients more sensitive to the price of the drug than they would be if Medicare were paying the full cost, the requirement creates "an incentive to choose the most cost-effective treatment."  JA42.

2.	Regeneron manufactures a drug called Eylea, which is used for the treatment of an ophthalmological condition known as neovascular age-related macular degeneration, or "wet AMD."  JA1304.  Eylea is administered by physicians in their offices, so it is covered by Medicare Part B.  JA1305.  It is "a 'buy and bill' drug, which means that physicians buy the drug before prescribing and administering it to patients" and then "filing a claim with Medicare … and receiving reimbursement."  *Id.*

A foundation known as the Chronic Disease Fund offered financial assistance to help wet-AMD patients afford copayments for drugs, including Eylea, that are FDA-approved for the treatment of that condition.  JA1305.  Regeneron made financial

_____

[1] The Inflation Reduction Act of 2022 reduces the 20% coinsurance amount for drugs the prices of which increase faster than the rate of inflation.  Pub. L. No. 117-169, tit. I, subtitle B, pt. 2, § 11101, 136 Stat. 1818, 1865-1871.  That change postdates the time period at issue in this case.

contributions to the Fund.  *Id.*  The Fund did not offer assistance for patients using a drug that is commonly prescribed off-label for the treatment of wet AMD—a drug with a "dramatically lower" price than the drugs for which the Fund provided assistance. JA1305, 1325.

3.    The government brought this suit under the FCA, alleging that Regeneron's payments to the Fund constituted remuneration with the purpose of inducing Eylea purchases, in violation of the AKS.  JA79-114.  The government alleged that Regeneron chose a high price for Eylea "because it knew that it could eliminate any financial burden that the higher price would impose on Medicare patients and their physicians simply by paying more to a foundation that would cover the proportionately higher Medicare co-pays for Eylea."  JA79.  As a result of Regeneron's AKS violations, the government alleged, Medicare claims for Eylea provided to patients receiving subsidies from the Fund were false or fraudulent within the meaning of the FCA.  JA108-112.

The district court denied Regeneron's motion to dismiss.  JA41-78.  In that motion, Regeneron argued that the government had not adequately pleaded falsity under § 1320-7b(g) because the complaint did not allege that "any specific Medicare claim for Eylea 'result[ed] from' an AKS-violating donation by" Regeneron "as opposed to a donation" to the Fund from Regeneron's "competitor, Genentech," which manufactured different drugs for the treatment of wet AMD.  JA69.  The district court rejected that argument, holding that the complaint adequately pleaded falsity by alleging "that at least

eleven claimants who received the tainted copay subsidies submitted claims to Medicare." JA71. The court favorably cited another district court's explanation "that a complaint sufficiently states a violation of the FCA if it alleges that [the] '[d]efendant paid kickbacks to physicians … to induce those physicians to prescribe particular medications, and that the physicians then prescribed those medications, causing claims to be submitted to Medicare and Medicaid.'" JA70 (quoting *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, 2018 WL 1996829, at *6 (D. Mass. Apr. 27, 2018)).

In ruling on cross-motions for summary judgment, however, the district court changed course. A14-25, 29-30.[2] Relying principally on the Eighth Circuit's decision in *United States ex rel. Cairns v. D.S. Medical LLC*, 42 F.4th 828 (8th Cir. 2022), and the Sixth Circuit's decision in *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043 (6th Cir.), *cert. denied*, 144 S. Ct. 224 (2023), the court concluded that Congress's use of "the 'resulting from' language" in § 1320a-7b(g) "requires" a showing of "but-for causation." A23. Thus, the court determined that even if Regeneron's payments to the Fund were meant "to induce" purchases of Eylea, 42 U.S.C. § 1320a-7b(b)(2), and even if patients who received subsidies from the Fund then used Eylea, and even if claims for Eylea provided to those patients were then submitted to Medicare, those claims are not false under § 1320a-7b(g) unless the government shows that those patients would not have used

---

[2] "A" citations refer to the addendum to this brief, whereas "JA" citations refer to the joint appendix.

Eylea but for Regeneron's payments.[3]  The court was unpersuaded that *Guilfoile v. Shields*, 913 F.3d 178 (1st Cir. 2019)—in which this Court favorably cited two decisions rejecting such a requirement—directed a different result.  A15-16; *see Guilfoile*, 913 F.3d at 190 (citing *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96-98 (3d Cir. 2018); *Bawduniak*, 2018 WL 1996829, at *5-6).

The district court denied Regeneron's motion for summary judgment on this issue, concluding that the government had "proffered sufficient evidence to establish but-for causation."  A25-27.  Presumably for that reason, the district court did not address the government's argument, offered in opposition to Regeneron's motion for summary judgment, that the government could also "establish material falsity without reliance on" § 1320a-7b(g) by showing that the claims at issue had falsely certified compliance with the AKS.  Dkt. 274 at 23 (citing *Hutcheson*, 647 F.3d at 392-394).  The court also denied the government's motion for partial summary judgment that it had established the requisite connection between Regeneron's AKS violations and the claims at issue.  A29-30.

---

[3] The district court opined that a "but-for causation" standard would not be "insuperably difficult" to satisfy, because "but-for causation does not normally require that an actor be the sole factual cause of a harm."  A24.  "Under traditional principles," the court noted, "a negligent act will satisfy the but-for causation requirement if it was a 'substantial factor in bringing about' the harm."  *Id.*  But the only reassurance the court drew from those precepts was that the government would "not need to prove that the AKS violation was the *only* cause of the resulting false claim."  *Id.* (emphasis added).

4.     Regeneron proposed that the district court sua sponte certify its summary-judgment ruling for interlocutory appeal. Dkt. 360. The district court agreed. JA1299-1301. The United States then filed a petition for permission to appeal, which this Court granted.

## SUMMARY OF ARGUMENT

A.     Courts recognized long before the enactment of § 1320a-7b(g) that a false representation of compliance with the AKS could render a Medicare or Medicaid claim false or fraudulent. To prevail on a false-certification theory, a plaintiff need not prove that the claimed items or services would not have been provided but for a kickback. That is because the AKS forbids kickbacks that are given to induce the purchase of particular items or services, regardless of whether the kickbacks can be shown to have altered medical decisionmaking.

There is no basis to conclude that § 1320a-7b(g), which Congress added to the AKS in an effort to make it *easier* to prove falsity under the FCA based on AKS violations, requires proof that a kickback altered medical decisionmaking—proof that is otherwise irrelevant under the AKS. Rather, the provision's text and context make clear that if kickbacks are given to induce the purchase of a particular drug, and the intended purchase then happens, a claim seeking reimbursement for the purchase "includes items or services resulting from a violation of [the AKS]," 42 U.S.C. § 1320a-7b(g).

This Court's decision in *Guilfoile v. Shields*, 913 F.3d 178 (1st Cir. 2019), strongly suggested as much. When the Court referred to "a sufficient causal connection between

- 8 -

an AKS violation and a claim submitted to the federal government," *id.* at 190, it presumably meant the kind of connection recognized as sufficient in the two decisions it cited for that proposition. Both of those decisions rejected the view that a claim is false under § 1320a-7b(g) only if the claimed items or services would not have been provided but for a kickback. Under those decisions, if a kickback is given to induce the purchase of particular items or services, and those intended results materialize, then a claim seeking reimbursement for them is false within the meaning of § 1320a-7b(g) just as it would have been false under the preexisting false-certification caselaw. Many other courts have adopted that interpretation, and it is bolstered by the legislative history of § 1320a-7b(g), on which this Court relied in *Guilfoile*.

B. The district court relied on contrary decisions of the Sixth and Eighth Circuits. But those courts erred in holding that § 1320a-7b(g)'s "resulting from" language requires a showing of but-for causation. They based that holding on the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 204 (2014), but the Supreme Court recognized both in *Burrage* and in *Paroline v. United States*, 572 U.S. 434 (2014), decided later the same Term, that the "but-for test" is nothing more than a "default" standard of causation in fact, *id.* at 458. Courts must examine whether there is a "textual or contextual indication," *Burrage*, 571 U.S. at 212, that a different standard applies. And here there are many textual and contextual reasons to think that, as used in § 1320a-7b(g), "resulting from" does not require proof of but-for causation.

When Congress enacted § 1320a-7b(g) as an amendment to the AKS, it built on a statutory scheme under which the propriety of particular payments turns on the purpose for which those payments were made, rather than on whether the payments actually caused the outcome that they were given "to induce," 42 U.S.C. § 1320a-7b(b)(2). There is no basis to read § 1320a-7b(g) as requiring proof that a kickback actually induced particular outcomes—proof that is otherwise irrelevant under the AKS. If a kickback is given with the purpose of inducing the purchase of particular items or services, and that result comes to pass, a claim seeking reimbursement for those items or services is "a claim that includes items or services resulting from" the kickback, 42 U.S.C. § 1320a-7b(g).

The district court here was incorrect to regard that interpretation of § 1320a-7b(g) as difficult to articulate or apply. The hypothetical that the district court offered in support of that conclusion in fact underscores the profound flaws of the Sixth and Eighth Circuits' standard.

## STANDARD OF REVIEW

This Court reviews "summary-judgment rulings de novo." *Thiersaint v. Department of Homeland Sec.*, 85 F.4th 653, 657 (1st Cir. 2023).

# ARGUMENT

## THE DISTRICT COURT ERRED IN REQUIRING PROOF THAT EYLEA CLAIMS WOULD NOT HAVE BEEN SUBMITTED BUT FOR REGENERON'S KICKBACKS

### A. If Kickbacks Are Given To Induce The Purchase Of Items, Claims For Those Items Are False Under § 1320a-7b(g)

1. The AKS provision relevant here prohibits kickbacks meant "to induce" the recipient "to purchase, lease, order … or recommend purchasing, leasing, or ordering any … item" reimbursable by "a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The AKS also prohibits kickbacks "to induce" referrals "for the furnishing of any item or service" reimbursable by "a Federal health care program," *id.*, and the solicitation or receipt of kickbacks "in return for" referrals or the provision of federally reimbursable items and services, *id.* § 1320a-7b(b)(1).

As its text makes clear, the AKS does not require that a kickback be successful—*i.e.*, that it actually cause the recipient to take the actions that the payor sought "to induce"—for the kickback to be illegal. *See, e.g.*, *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) ("The AKS's plain language … makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results."), *aff'd sub nom. United States ex rel. Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014). Congress chose to forbid kickbacks *themselves*, recognizing that financial conflicts inherently corrupt medical decisionmaking.

Compliance with the AKS "is a precondition" of reimbursement from federal healthcare programs like Medicare and Medicaid. *United States ex rel. Hutcheson v.*

*Blackstone Med., Inc.*, 647 F.3d 377, 393 (1st Cir. 2011); *see also, e.g., United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 54 (D. Mass. 2011) (collecting cases for the proposition that "courts, without exception, agree that compliance with the [AKS] is a precondition of Medicare payment"). For that reason, courts recognized long before the enactment of § 1320a-7b(g) that a violation of the AKS could give rise to FCA liability. *See Westmoreland*, 812 F. Supp. 2d at 54 (similar) (collecting numerous decisions to that effect). Those decisions rested on the understanding that a claim is false when it inaccurately certifies compliance with a material condition of payment. *See, e.g., Hutcheson*, 647 F.3d at 392-394; *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313-314 (3d Cir. 2011), *abrogated on other grounds by Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016); *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005).[4]

To establish falsity based on AKS violations under a false-certification theory, a plaintiff need not show that the claimed items or services would not have been provided but for a kickback. It is sufficient to show that a claim expressly or impliedly represented compliance with the AKS, that that representation was material, and that it was false because the claimed items or services were among those that the kickback was

---

[4] This method of establishing falsity based on AKS violations remains available today. *See, e.g., United States ex rel. Heller v. Guardian Pharm. of Atlanta, LLC*, 2024 WL 102211, at *1-3 (N.D. Ga. Jan. 9, 2024); *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, 2023 WL 36174, at *2-3 (D. Minn. Jan. 4, 2023), *appeal pending*, No. 24-1467 (8th Cir.). *But see United States ex rel. Louderback v. Sunovion Pharm., Inc.*, 2023 WL 8188879, at *13 (D. Minn. Nov. 27, 2023).

given to induce. In *Hutcheson*, for example, the relator alleged that a manufacturer had "engaged in a nationwide kickback scheme to induce physicians to use its medical devices in spinal surgeries and that [the manufacturer] knew this scheme would cause physicians and hospitals (unwittingly) to present federal healthcare programs with payment claims that contained material misrepresentations" of compliance with the AKS. 647 F.3d at 378. This Court held that the complaint "state[d] a claim under the FCA that the hospital and physician claims for payment … were materially false or fraudulent" because they misrepresented compliance with the AKS. *Id.* at 379. From that conclusion, the Court held, "[i]t follows that [the relator had] stated a claim that [the manufacturer] knowingly caused the submission of materially false or fraudulent claims." *Id.* at 379-380. The Court reached that holding without any discussion of whether the physicians targeted by the kickback scheme might have used the manufacturer's devices even absent the kickbacks.

2.      In the order certified for appeal, the district court did not address whether the government could establish falsity under a false-certification theory; it addressed only the proof of falsity under § 1320a-7b(g).[5] That provision, as discussed above, states that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." The question

---

[5] As noted above (at 7), that was presumably because the government did not seek summary judgment on a false-certification theory and because the district court concluded that the government's evidence at summary judgment was sufficient to proceed to trial even under its narrow construction of § 1320a-7b(g).

on appeal is therefore whether § 1320a-7b(g) requires a type of proof that is unnecessary to establish false-certification liability arising from an AKS violation—namely, proof that the claimed items or services would not have been provided but for the AKS violation. The district court erred in concluding that it does.

Section 1320a-7b(g), enacted in 2010 against the backdrop of cases recognizing the false-certification theory, offered a pathway to establish falsity in FCA actions based on AKS violations without reliance on that theory. It eliminates the need to prove the materiality of a false representation of AKS compliance, as is required under a false-certification theory, *see Universal Health Servs.*, 579 U.S. at 181. Instead, it creates a per se rule of falsity. *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019). And it makes clear that an AKS violation renders false any claim for the items or services that the kickback was given to induce, regardless of who submits the claim. The provision thus abrogated a then-recent decision, *United States ex rel. Thomas v. Bailey*, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008), that had concluded that a hospital's reimbursement claims for surgeries were not false, even though a manufacturer had violated the AKS by paying a surgeon to use its products in those surgeries, because the hospital had not itself violated the AKS or been aware of the violation. 155 Cong. Rec. S10,853; *see United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 333-335 (S.D.N.Y. 2014).

The point of the AKS is that financial conflicts are so inherently corrupting that they are punishable as felonies regardless of whether they can be shown to have produced a concrete change in medical decisionmaking. If kickbacks are given with the

purpose required by the AKS—as relevant here, if they are given to induce the purchase of a particular drug—and if the intended purchases then come to pass, then it is clear from the text and context of § 1320a-7b(g) that claims seeking reimbursement from a federal healthcare program for those purchases "include[] items or services resulting from a violation of [the AKS]."  42 U.S.C. § 1320a-7b(g).

3.  This Court has strongly suggested that it agrees.  In *Guilfoile*, the Court addressed a claim that the plaintiff "was fired from his job in retaliation for," among other things, "accusing his employer of violating the [AKS]."  913 F.3d at 182.  In order to determine the sufficiency of the plaintiff's pleading, the Court analyzed whether his "employer's conduct 'reasonably could lead to an FCA action.'"  *Id.* at 189.  The Court explained that it was "not attempt[ing] to assess the full implications of" § 1320a-7b(g), since the question presented was whether the plaintiff had "plead[ed] an FCA retaliation claim" rather than "the standard for proving an FCA violation based on the AKS."  *Id.* at 190 (emphases omitted).  But the Court cited two cases for the proposition that, "if there is a sufficient causal connection between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA."  *Id.*

One of the cited cases was *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89 (3d Cir. 2018).  There, a relator claimed that the defendant pharmacy had paid kickbacks to charities in exchange for their recommending its services, *id.* at 92, but there was no evidence at summary judgment that any of the patients at issue

had seen or heard the improper recommendations, *id.* at 99-100. The Third Circuit concluded—as the government had urged as amicus—that without such evidence, there was not a sufficient "link" between the "alleged kickback scheme" and "any particular claim." *Id.* at 100. Mere "temporal proximity between [the] alleged kickback plot and the submission of claims for reimbursement" was not enough, the court explained, for the claims to be considered false. *Id.*

But the court rejected the defendants' argument that an FCA plaintiff can prove the falsity of claims based on an underlying AKS violation only by showing that the claimed items or services would not have been provided but for the AKS violation. 880 F.3d at 95-98. Rather, the court agreed with the government's argument that "'if a medical service provider pays kickbacks to a doctor to induce referrals and then submits claims to Medicare for services it provided to patients who were referred by that doctor, the claims are false,'" and that that is true "'regardless of whether the doctor would have referred the patients absent the kickbacks … and regardless of whether the patients would have chosen the service provider absent the referral.'" *Id.* at 98. *Greenfield*'s reasoning thus makes clear that, if the plaintiff had provided evidence that the charities receiving kickbacks from the defendant pharmacy had recommended that pharmacy to the particular patients for whom claims were later submitted, that evidence would have sufficed to establish the falsity of the claims, regardless of any conjecture about whether the patients might have used the pharmacy even absent the kickbacks.

The other case on which this Court relied in *Guilfoile* was *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, 2018 WL 1996829 (D. Mass. Apr. 27, 2018), in which the district court denied a motion to dismiss FCA claims based on allegations that the defendant had paid kickbacks to induce doctors to prescribe its drugs, *id.* at *1. The court concluded, in addressing claims for conduct postdating the enactment of § 1320a-7b(g), that there was "'no indication … that Congress intended to narrow the scope of "falsity" under the FCA when it amended the AKS to add'" that provision. *Id.* at *5. Applying *Greenfield*, the court held that the relator had adequately pleaded falsity by "alleg[ing] that [the] Defendant paid kickbacks to physicians identified in the Complaint to induce those physicians to prescribe particular medications, and that the physicians then prescribed those medications, causing claims to be submitted to Medicare and Medicaid." *Id.* at *6.

*Guilfoile*'s favorable citation of *Greenfield* and *Bawduniak* strongly suggests that, when the Court referred to "a sufficient causal connection between an AKS violation and a claim submitted to the federal government," 913 F.3d at 190, what it meant was the kind of connection recognized as sufficient in those cases. Under that standard, if a kickback is given to induce the purchase of particular items or services, and those intended results materialize, then a claim seeking reimbursement for them is false or fraudulent within the meaning of § 1320a-7b(g), just as it would have been false or fraudulent under the false-certification caselaw predating the enactment of that provision. Numerous other courts, including another within the District of Massachusetts,

have adopted that interpretation of § 1320a-7b(g).  *See United States v. Teva Pharm. USA, Inc.*, __ F. Supp. 3d __, 2023 WL 4565105, at *2-5 (D. Mass. July 14, 2023), *appeal pending*, No. 23-1958 (1st Cir.); *United States ex rel. Fitzer v. Allergan, Inc.*, 2022 WL 3599139, at *9 (D. Md. Aug. 23, 2022); *Kuzma v. Northern Ariz. Healthcare Corp.*, 607 F. Supp. 3d 942, 956-957 (D. Ariz. 2022); *United States v. Teva Pharm. USA, Inc.*, 2019 WL 1245656, at *24, *27 (S.D.N.Y. Feb. 27, 2019); *see also United States v. Medtronic, Inc.*, 2021 WL 4168140, at *23-24 (D. Kan. Sept. 14, 2021) (rejecting a but-for causation requirement); *Kester*, 41 F. Supp. 3d at 331-335 (same).

That inference from *Guilfoile* is bolstered by the Court's explanation that its "reading of § 1320a-7b(g)" was "consistent with the legislative history" of that provision.  913 F.3d at 190.  As discussed above (at 3, 14), the legislative history establishes that Congress enacted § 1320a-7b(g) in an effort "to 'strengthen[] whistleblower actions based on medical care kickbacks.'"  *Id.* (quoting 155 Cong. Rec. S10,853).  It is inconsistent with that objective to interpret § 1320a-7b(g) to require a novel showing that the claimed items or services would not have been provided but for an AKS violation.  And there is no basis to believe Congress meant for the provision's "resulting from" language to have that effect.

To the contrary, the legislative history evinces with unusual clarity why Congress used that language:  It meant to overrule a district-court decision that had found a hospital's reimbursement claims for surgeries were not false, even though a manufacturer had violated the AKS by paying a doctor to use its products in those surgeries, because

the hospital had not itself violated the AKS or been aware of the violation. The language would make clear, the sponsor explained, "that all claims resulting from illegal kickbacks are 'false or fraudulent,' even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10,853; *see id.* at S10,854; *Kester*, 41 F. Supp. 3d at 334. Congress thus meant for the "resulting from" language to have exactly the meaning that numerous courts have given it. In the case that Congress meant to overrule, where a manufacturer paid a doctor to induce him to use the manufacturer's devices, claims for surgeries performed using those devices would be false under § 1320a-7b(g) because those were exactly the results that the manufacturer sought to induce through its kickbacks.

**B.    The District Court's Contrary Reasoning Is Unpersuasive**

1.    The district court based its analysis largely on the Eighth Circuit's decision in *United States ex rel. Cairns v. D.S. Medical LLC*, 42 F.4th 828 (8th Cir. 2022), and the Sixth Circuit's decision in *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043 (6th Cir.), *cert. denied*, 144 S. Ct. 224 (2023). Those courts, in turn, relied principally on the Supreme Court's holding in *Burrage v. United States*, 571 U.S. 204 (2014), that the phrase "'[r]esults from' imposes … a requirement of actual causality" (*i.e.*, causation in fact) and that, "'[i]n the usual course,'" causation in fact means that a given outcome "would not have occurred in the absence of—that is, but for"—a given event. *Id.* at 211 (quotation marks omitted); *see Martin*, 63 F.4th at 1052-1053; *Cairns*, 42 F.4th at 834-835.

Crucially, however, the Supreme Court recognized—during the same Term when it decided *Burrage*—that the "but-for test" is nothing more than a "default" standard of causation in fact. *Paroline v. United States*, 572 U.S. 434, 458 (2014). Other options exist, and "the availability of alternative causal standards where circumstances warrant is, no less than the but-for test itself as a default, part of the background legal tradition against which Congress has legislated." *Id.* Thus, *Burrage* itself explains that courts properly "read phrases like 'results from' to require but-for causality" only if "there is no textual or contextual indication to the contrary." 571 U.S. at 212. Otherwise, "circumstances" may "warrant" an "alternative causal standard[]." *Paroline*, 572 U.S. at 458.

The Sixth and Eighth Circuits engaged in no meaningful analysis of whether there is a "textual or contextual indication," *Burrage*, 571 U.S. at 212, that but-for causation is not the appropriate standard under § 1320a-7b(g). Both courts treated the phrase "resulting from" as virtually dispositive, even though—as *Burrage* and *Paroline* explain— that phrase connotes only *some* requirement of causation in fact, saying nothing about what standard of causation should apply. *See Fitzer*, 2022 WL 3599139, at *10 (noting the Eighth Circuit's failure to address the "contextual indications" that a standard other than but-for causation applies under § 1320a-7b(g)). The Sixth and Eighth Circuits' reasoning flouts not only *Burrage* and *Paroline* but the broader principle that "statutory provisions must be interpreted by reference to the structure and context of the broader statutory scheme in which they reside." *United States v. Saemisch*, 70 F.4th 1, 7 (1st Cir.

2023); *see United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 753-754 (2023) (applying this principle to the FCA).

2.        Had the Sixth and Eighth Circuits more rigorously engaged with the analysis prescribed by *Burrage* and *Paroline*, they could not properly have concluded that § 1320a-7b(g)'s "resulting from" language requires a showing of but-for causation. It is far more consistent with § 1320a-7b's text and context to read the "resulting from" language as prescribing the same type of nexus requirement adopted by *Greenfield*, embraced by numerous district courts, and impliedly endorsed by this Court in *Guilfoile*.

a.        Start with statutory text and structure. As discussed above, the AKS identifies what Congress regards as a problematic nexus between a kickback and a medical decision. The AKS specifies, as relevant here, that kickbacks are unlawful when given "to induce" the purchase of particular items or services. 42 U.S.C. § 1320a-7b(b)(2). As its "plain language" makes clear, the AKS does not limit liability to situations where the desired outcome of the kickbacks actually materializes, much less to situations where the kickback is the but-for cause of the outcome. *Parikh*, 977 F. Supp. 2d at 665. Such a limitation would be inconsistent with the AKS's animating principle, namely that financial conflicts in themselves corrupt medical decisionmaking.

When Congress enacted § 1320a-7b(g) as an amendment to the AKS, it thus built on a statutory scheme under which the propriety of particular payments turns on the presence or absence of a specified nexus between those payments and the provision of federally reimbursable items or services—namely, on whether the payments were given

to induce the provision of the items or services. Section 1320a-7b(g)'s presence within a statute that requires a specified link between a kickback and a given outcome, but that does *not* require but-for causation, strongly suggests that that provision's "resulting from" language likewise does not require a showing of but-for causation. Rather, the natural inference from the text and structure of § 1320a-7b is that the nexus requirement of the AKS's substantive prohibition—the prohibition of kickbacks meant "to induce" a given outcome, 42 U.S.C. § 1320a-7b(b)(2)—carries over into the provision, § 1320a-7b(g), addressing when a claim for items or services tainted by a kickback is false for FCA purposes. If the claimed items or services are those that the kickback was given to induce, then the statutory text and context make clear that the claim "includes items or services resulting from" the kickback within the meaning of § 1320-7b(g).

b. Other "contextual" factors, *Burrage*, 571 U.S. at 212, bolster the inference from statutory text and structure that the "resulting from" language should not be read to require a showing of but-for causation.

First, there is no basis to believe that Congress—having imposed *criminal* liability for kickbacks without requiring a showing that the kickbacks actually changed medical decisionmaking—meant to require that heightened showing to impose civil liability under the FCA for claims rendered false by AKS violations. *See Greenfield*, 880 F.3d at 96; *Fitzer*, 2022 WL 3599139, at *10. The Medicare and Medicaid programs "offer[] a subsidy … with conditions," *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008), one of

which is AKS compliance, *see supra* pp. 2, 11-12. "When the conditions are not satisfied, nothing is due." *Rogan*, 517 F.3d at 453. The United States is thus harmed by kickbacks, which inherently compromise the integrity of medical decisionmaking, regardless of whether the same care might have been provided (and federally reimbursed) absent the kickback. The government simply "'does not get what it bargained for when a defendant is paid … for services tainted by a kickback,'" *Wilkins*, 659 F.3d at 314, regardless of whether the kickback actually altered medical decisionmaking.

Second, as noted above, the legislative history of § 1320a-7b(g) is devastating to the interpretation adopted in *Cairns* and *Martin*. As this Court recognized in *Guilfoile*, Congress meant to make it *easier* to prove "'whistleblower actions based on medical care kickbacks,'" including by simplifying the proof required under the "long-standing" false-certification case law. 913 F.3d at 190-191. It is flatly inconsistent with that objective to require plaintiffs to establish that claimed items or services would not have been purchased but for a kickback. *See Fitzer*, 2022 WL 3599139, at *10; *Kester*, 41 F. Supp. 3d at 332-333. As discussed above, that sort of showing is not required to prove false-certification liability because it has nothing to do with whether a claimant's representation of compliance with the AKS is false. It defies reason to believe that Congress meant to add an onerous element of proof in legislation otherwise meant to facilitate the proof of falsity in FCA cases based on AKS violations. Courts "'should not lightly conclude that Congress enacted a self-defeating statute.'" *Pugin v. Garland*, 599 U.S. 600, 607 (2023).

The Sixth Circuit indicated that it would be improper to "consider legislative history in construing a statute with criminal applications." *Martin*, 63 F.4th at 1054. But the Sixth Circuit was incorrect to characterize § 1320a-7b(g) as "a statute with criminal applications." The AKS's substantive prohibition against kickbacks, 42 U.S.C. § 1320a-7b(b), imposes criminal liability—but § 1320a-7b(g) simply specifies that certain claims are "false or fraudulent … for purposes of" the FCA, which imposes solely civil liability. The interpretation of § 1320a-7b(g)'s "resulting from" language has no criminal-law consequences whatsoever.

In any event, although the Sixth and Eighth Circuits were correct that courts do not generally look to legislative history where statutory text is clear—whether in the criminal-law context or in any other—this is not a case where legislative history and other contextual indicators of statutory meaning stand in tension with the statutory text. As discussed above, § 1320a-7b(g)'s "resulting from" language is silent as to the appropriate standard of factual causation, and the text and structure of § 1320a-7b more broadly support the same interpretation as does the legislative history.

In short, both "textual [and] contextual" factors, *Burrage*, 571 U.S. at 212, make clear that § 1320a-7b(g) is one of those provisions for which "circumstances warrant" an "alternative" to the "default" but-for standard of causation in fact, *Paroline*, 572 U.S. at 458. The standard adopted by *Greenfield*, followed by numerous district courts, and impliedly endorsed by this Court in *Guilfoile* is a far more natural interpretation of "resulting from." Under that standard, when kickbacks are given "to induce" the purchase

of items or services, 42 U.S.C. § 1320a-7b(b)(2), a claim seeking reimbursement for those items or services "includes items or services resulting from" the kickback, *id.* § 1320a-7b(g).

3.    To the extent the district court's analysis here went beyond the reasoning of *Cairns* and *Martin*, it did nothing to shore up their conclusions. The district court's principal concern appeared to be that it is difficult to articulate or apply a nexus standard other than but-for causation. But the faultiness of that reasoning is clear from the fact that the Third Circuit, and numerous district courts, have had no difficulty articulating and applying the standard discussed above.

The district court's hypothetical—offered to illustrate the supposed difficulties in applying the government's proposed standard, and the virtues of the but-for approach—actually shows the opposite. "Suppose," the district court posited, that

> a doctor has two options for treating a patient with a particular condition: product A or product B. Each year for several years, she writes 50 prescriptions for A and 50 for B. One year, she receives unlawful remuneration from the manufacturer of A, and her prescriptions that year rise to 75 for A and drop to 25 for B. If permitted (and, presumably, immunized), she would testify that based on her medical judgment, and in the absence of any remuneration, that year she would have written 65 for A and 35 for B. All the prescriptions resulted in Medicare claims.

A21. Under the proper interpretation of § 1320a-7b(g), discussed above, this is a straightforward hypothetical, the resolution of which boils down to a determination of what the remuneration was meant to induce. If the circumstances of the remuneration make clear that its purpose was to induce the doctor to prescribe product A instead of

product B in the following year, then every one of the doctor's prescriptions of product A during that year is a financially conflicted medical decision—exactly the kind of corrupted medical care that the AKS is meant to prevent. And every reimbursement claim for such a prescription is false or fraudulent, because the government "'does not get what it bargained for when'" it pays a claim for items or "'services tainted by a kickback.'" *Wilkins*, 659 F.3d at 314.

Under a but-for causation standard, by contrast, claims for the doctor's subsequent prescriptions of product A would be false only if the doctor would not have written those prescriptions but for the kickback. But it can sometimes be difficult "'to unravel why doctors … recommended a given drug or service to patients,'" *Teva*, 2019 WL 1245656, at *23, because "'the medical needs of a particular patient can be highly judgmental,'" *Greenfield*, 880 F.3d at 96. Indeed, doctors themselves may not know whether they would have treated a particular patient differently had they not been operating under a financial conflict of interest. That is a central reason why Congress chose to forbid kickbacks in themselves. *See id.* (discussing H.R. Rep. No. 95-393 (1977)).

Moreover, the application of the but-for standard to this hypothetical illuminates the substantive problem with the standard. When a doctor is receiving a kickback for prescribing product A over product B, it is impossible to trust that she is making *any* such prescribing decision with her patient's best interests rather than her own financial interests in mind. The but-for standard would treat 50 of the 75 post-kickback

prescriptions as proper, and reimbursement claims for those prescriptions as lawful, simply because the doctor had written 50 such prescriptions in the past. But medical science constantly evolves, new drugs come onto the market, and every patient who comes before a doctor has particular needs that might make a given drug more or less appropriate. That is why it is crucial to be able to trust that doctors, like lawyers and other fiduciaries, make decisions free from the unavoidable conflict created by financial inducements. Suppose, for example, that products A and B are alternative courses of treatment for a child facing a life-threatening illness, each with its own risks and potential benefits. If the child's parents learned that the doctor was being paid by the manufacturer of product A, they would hardly be reassured by the knowledge that the doctor had used the same drug two-thirds as often before the kickbacks began.

The district court expressed concern that treating all 75 of the doctor's post-kickback prescriptions of product A as improper, rather than some lesser number, would be inconsistent with the Third Circuit's rejection in *Greenfield* of what the district court referred to as "a 'taint' standard." A22. That reasoning misunderstands the Third Circuit's decision. As discussed above (at 15-16), what the Third Circuit rejected—at the government's urging, *see* U.S. Amicus Br. 14-15, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, No. 17-1152 (3d Cir. Apr. 17, 2017)—was the proposition that all reimbursement claims submitted by the defendant pharmacy were false simply because the pharmacy had paid kickbacks to charities to induce them to recommend its services. The Third Circuit correctly recognized that, if the patients at issue had come to the

defendant pharmacy without having seen or heard of the recommendations the pharmacy had paid to induce, then claims for prescriptions provided to those payments would not be false because the claims would lack any connection to the kickbacks. By contrast, the Third Circuit agreed with the government that "'if a medical service provider pays kickbacks to a doctor to induce referrals and then submits claims to Medicare for services it provided to patients *who were referred by that doctor*, the claims are false.'" 880 F.3d at 98 (emphasis added). And that is true, the court recognized, "'regardless of whether the doctor would have referred the patients absent the kickbacks … and regardless of whether the patients would have chosen the service provider absent the referral.'" *Id.*

*Greenfield* thus supports the conclusion that, if the manufacturer in the district court's hypothetical intended to induce prescriptions of product A, then reimbursement claims for all 75 of the post-kickback prescriptions of product A would be false under § 1320a-7b(g). Those are claims for exactly the prescriptions that the manufacturer sought to induce by paying the kickback. The theory the Third Circuit rejected, by contrast, would have treated reimbursement claims for all 100 post-kickback prescriptions—of product A *or* product B—as false simply because they occurred after the doctor received a kickback. The district court erred in reading *Greenfield*, which roundly rejected the district court's interpretation of § 1320a-7b(g), as supporting that interpretation in any way.

The district court further misunderstood *Greenfield* in characterizing that opinion as "effectively bar[ring] the defendant from contesting the government's evidence of causation once an AKS violation is proved," A22. The Third Circuit's opinion on its face refutes that characterization: The Third Circuit held that the FCA claims against the defendant pharmacy could not survive summary judgment, even assuming that the pharmacy had violated the AKS by paying kickbacks to induce referrals, because there was no evidence that the allegedly false claims were for patients who had received the recommendations that the pharmacy had paid to induce.

Finally, the district court was incorrect to read *Greenfield* as suggesting that "an AKS violation" arising from the payment of kickbacks to physicians to induce particular prescriptions "could lead to liability even if all of the prescribing physicians were unaware of the violation," A23. To the extent the district court's concern was that physicians could themselves be held liable for submitting false claims if they were unaware of the AKS violation that rendered the claims false, the FCA's scienter requirement would prevent that. 31 U.S.C. § 3729(a)(1) (requiring knowledge for FCA liability); *see id.* § 3729(b) (defining knowledge). And to the extent the concern was that drug companies could be held liable for having caused the submission of false claims by paying kickbacks meant to induce the prescription or administration of the claimed items, it is unclear why that would be a concern. Congress enacted § 1320a-7b(g) precisely to ensure that claims rendered false by an AKS violation would be treated as false even if submitted by a party that did not know about the violation, *see supra* pp. 3, 14, and this

Court reached the same conclusion as to a false-certification theory of falsity in *Hutcheson*, 647 F.3d at 388-392.

In short, the district court's concerns about the government's proposed interpretation of § 1320a-7b(g) were unfounded. The interpretation is straightforward: If a kickback is given to induce the purchase of particular items or services, and those intended results materialize, then a claim seeking reimbursement for them is false or fraudulent within the meaning of § 1320a-7b(g). That standard imposes a genuine limitation on liability, requiring plaintiffs to establish that the claims at issue seek reimbursement for the particular items or services—or items or services provided in the course of particular referrals—that the kickback was intended to induce. That is why, in the district court's example, no FCA liability would arise from the doctor's post-kickback prescriptions of product B: Those were not the prescriptions that the manufacturer of product A sought to induce. But the standard would prevent the manufacturer from seeking to avoid liability by arguing that the doctor would have prescribed product A even had she not been paid to do so. As discussed above, evidence of that nature should be irrelevant; once the doctor has been paid to induce prescriptions of product A, *every* prescription she writes for product A reflects exactly the kind of corrupted medical decisionmaking that the AKS serves to prevent and that is ineligible for coverage by federal healthcare programs. It defies reason to construe § 1320a-7b(g) in a manner that would mean that paying a kickback to induce a prescription is illegal under the AKS but that a claim seeking reimbursement for that very same prescription

is false under § 1320a-7b(g) only if the plaintiff can show that the kickback actually altered the doctor's prescribing behavior.

### C. This Court Should Vacate The Denial Of The Government's Motion For Partial Summary Judgment And Remand For Further Proceedings

In the order from which this appeal arises, the district court denied Regeneron's motion for summary judgment (except in one respect not relevant here) and denied the government's motion for partial summary judgment. If this Court agrees that the district court erred in construing § 1320a-7b(g), then it should affirm the denial of Regeneron's motion, vacate the denial of the government's motion, and remand for the district court to reevaluate the government's motion under the appropriate legal standard—that is, to determine whether there is any genuine dispute that the reimbursement claims at issue in this case were for patients who had received financial assistance from the Chronic Disease Fund.

**CONCLUSION**

The denial of Regeneron's motion for summary judgment should be affirmed.

The denial of the government's motion for partial summary judgment should be vacated and this case remanded for additional proceedings.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JOSHUA S. LEVY
*Acting United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH

 /s/ Daniel Winik
DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*
*daniel.l.winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,237 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

# ADDENDUM

## TABLE OF CONTENTS

31 U.S.C. § 3729 ........................................................................................A1

42 U.S.C. § 1320a-7b ...............................................................................A1

Memorandum and Order on the Government's Motion for Partial Summary
    Judgment and Regeneron's Motion for Summary Judgment (Sept. 27,
    2023), Dkt. No. 351 ...........................................................................A3

**31 U.S.C. § 3729**

**§ 3729. False claims**

(a) Liability for certain acts.—

(1) In general.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

… is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

…

**42 U.S.C. § 1320a-7b**

**§ 1320a-7b. Criminal penalties for acts involving Federal health care programs**

…

(b) Illegal remunerations

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

…

(g) Liability under subchapter III of chapter 37 of Title 31

In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.

…

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
UNITED STATES OF AMERICA,                     )
                                              )
            Plaintiff,                        )
                                              )        Civil Action No.
      v.                                      )        20-11217-FDS
                                              )
REGENERON PHARMACEUTICALS,                    )
INC.,                                         )
                                              )
            Defendant.                        )
_____         )

MEMORANDUM AND ORDER ON THE GOVERNMENT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
REGENERON'S MOTION FOR SUMMARY JUDGMENT

SAYLOR, C.J.

      This is a case alleging violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C.

§ 1320a-7b, and False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, by a pharmaceutical

company.  The United States has brought suit against Regeneron Pharmaceuticals, Inc., the

manufacturer of a drug named Eylea, alleging that Regeneron improperly funneled millions of

dollars to the Chronic Disease Fund ("CDF")—a purportedly independent charitable

foundation—to subsidize patient copays for Eylea.

      According to the government, the purpose of the payments was to induce physicians to

increase prescriptions of the drug at the expense of the Medicare Part B program.  Among other

things, the government asserts that the contributions to the foundation were not motivated by a

charitable purpose; instead, Regeneron employees solicited and received Eylea-specific data

from CDF and improperly used that data to determine the specific amounts Regeneron would

contribute, and their purpose in doing so, according to the government, was to increase sales of

Eylea.  The amended complaint alleges that Regeneron's actions violated the AKS and caused

the submission of false claims for payment to Medicare.

For its part, Regeneron contends that it donated to a *bona fide*, independent charity in a

manner that complied with the government's own regulatory guidance.  It further asserts that its

donations did not result in or cause any false claims because it was not the only donor for a

significant portion of the relevant period; CDF awarded assistance on a first-come, first-served

basis without regard to whether patients used Eylea or another FDA-approved treatment; CDF

had sufficient funds to cover all copay support provided to Eylea patients in 2013 and 2014

without any donations from Regeneron in each respective year; and a majority of Eylea patients

in 2013 were allocated funds from CDF before Regeneron made a single donation.

The government has moved for partial summary judgment on the issues of materiality,

causation, and damages under the FCA.  Regeneron has moved for summary judgment as to all

claims.  For the following reasons, the government's motion will be denied, and Regeneron's

motion will be granted in part and denied in part.

## I.     Background

Unless otherwise noted, the following facts are undisputed.

### A.     Factual Background

#### 1.     The Parties and the Medicare Copay Assistance Program

Regeneron Pharmaceuticals, Inc. is a pharmaceutical company.  (Answer ¶ 10).  It

manufactures Eylea, a drug that treats neovascular (wet) age-related macular degeneration

("AMD"), an eye disease that primarily affects elderly people.  (*Id.* ¶¶ 10, 29).  Eylea is

administered by injection into the eye at a physician's office.  (*Id.* ¶ 29).

Throughout the period from 2012 through 2014, the other primary drugs used by

physicians to treat wet AMD were Lucentis and Avastin, both of which are manufactured by

Genentech.  (Am. Compl. ¶ 30; Def.'s SUF ¶ 4).

Medicare, including the Part B program, covers physician-administered drugs, including Eylea.  (Answer ¶ 13).  Eylea is a "buy and bill" drug, which means that physicians buy the drug before prescribing and administering it to patients, filing a claim with Medicare (and, if applicable, a claim with a charity for copay assistance for the patient), and receiving reimbursement.  (*See* Docket No. 275, Ex. 2 ("Kiss Dep. Tr.") 328:14-329:3).

### 2.      **Regeneron's Donations to CDF**

The Chronic Disease Fund ("CDF") is a patient-assistance foundation.  (Gov't's SUF ¶ 6).  More than 99% of CDF's funding comes from pharmaceutical manufacturers.  (*Id.* ¶ 7; Docket No. 226, Ex. 3 ("Walley Dep. Tr.") 20:5-10).

From at least 2007 through 2014, CDF operated a fund to provide copay assistance to wet AMD patients (the "AMD fund").  (Def.'s SUF ¶ 15; Docket No. 247, Ex. 18 ("Walley Decl.") ¶ 5).  The AMD fund covered copays, deductibles, and co-insurance for Medicare patients who were prescribed AMD drugs.  (Gov't's SUF ¶ 9; Walley Dep. Tr. 26:5-27:14).  Originally, the AMD fund covered three FDA-approved treatments for wet AMD:  Lucentis, Macugen, and Visudyne.  (Def.'s SUF ¶ 18; Walley Decl. ¶ 6).  It did not, however, cover Avastin, which is used off-label for the treatment of wet AMD.  (*See* Def.'s SUF ¶ 9).  In 2011, after Eylea received FDA approval, the AMD fund added it as well.  (Def.'s SUF ¶ 19; Walley Decl. ¶ 6).

Regeneron had no role in establishing the AMD fund.  (Def.'s SUF ¶ 16; Walley Decl. ¶ 5).  Before 2011, Genentech, the manufacturer of Lucentis and Avastin, was the only manufacturer-donor to the AMD fund; it remained its leading donor until the end of 2013.  (Def.'s SUF ¶ 29; Walley Decl. ¶ 15).  In 2014, Regeneron became the AMD fund's only manufacturer-donor.  (Def.'s SUF ¶ 31; Walley Decl. ¶ 16).  Patients who received copay assistance for treatments from the AMD fund were not provided any information from CDF

3

about the source of the assistance they received.  (Def.'s SUF ¶ 28; Walley Decl. ¶ 13).

### B.    **Procedural Background**

As amended, the complaint alleges presentation of false claims in violation of the False

Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2009) (Count 1); making or using false records material

to a false or fraudulent claim in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B) (2009) (Count

2); and unjust enrichment (Count 3).  Essentially, the complaint alleges that Regeneron's efforts

to funnel money into CDF specifically to reimburse the copays of Eylea patients violated the

Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  The resulting claims to Medicare were

allegedly tainted by illegal kickbacks in violation of the FCA.

The government has moved for partial summary judgment on the issues of materiality,

causation, and damages under the FCA.  Regeneron has moved for summary judgment on all

counts.

## II.    **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

Summary judgment shall be granted when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine

issue is "one that must be decided at trial because the evidence, viewed in the light most

flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of

either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)

(citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable

inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st

Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

III.   **Analysis**

   A.   **Regulatory Framework**

The False Claims Act, 31 U.S.C. §§ 3729-33, imposes civil liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (a)(1)(B).  A "claim" is "any request or demand . . . for money or property" presented to an officer, employee, or agent of the United States.  31 U.S.C. § 3729(b)(2).

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, states that "[w]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase . . . or recommend purchasing . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program" shall be guilty of a felony.  42 U.S.C. § 1320a-7b(b)(2).

In 2010, Congress amended the AKS to provide that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g); Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (2010).  In other words, an "AKS violation that results in a federal health care payment is a per se false claim under the FCA."  *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) (quoting *United States ex rel. Lutz v. United States*, 853 F.3d 131, 135

(4th Cir. 2017)).

**B.      Regeneron's Motion for Summary Judgment**

Regeneron has moved for summary judgment on all claims.  As to the claims under the

FCA, it contends that the government (1) cannot prove a predicate AKS violation; (2) cannot

show that its donations resulted in the submission of any false Medicare claim; and (3) cannot

prove that Regeneron had the requisite knowledge and intent.  Regeneron has also moved for

summary judgment on the unjust-enrichment claim.  Each will be addressed in turn.

**1.      Whether the Government Can Show an AKS Violation**

The first question is whether the evidence is sufficient to establish a violation of the AKS.

As noted, that statute makes it illegal to "offer[] or pay[] any remuneration . . . to induce [any]

person . . . to purchase . . . or recommend purchasing . . . any . . . item for which payment may be

made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(2).

Liability under the AKS requires an "intent to induce a referral or recommendation"; "[a]n intent

to induce referrals . . . means an intent 'to gain influence over the reason or judgment' of the

[prescribing] physicians."  *United States v. Medtronic, Inc.*, 189 F. Supp. 3d 259, 268, 271 (D.

Mass. 2016) (quoting *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000)).  Put

another way, "the heartland of what the AKS is intended to prevent [is] the use of payments to

improperly influence decisions on the provision of health care that lead to claims for payment to

federal health care programs," such as Medicare.  *Guilfoile*, 913 F.3d at 192-93.

A person or company who offers or pays remuneration to a healthcare provider violates

the AKS "so long as *one purpose* of the offer or payment is to induce Medicare or Medicaid

patient referrals."  *McClatchey*, 217 F.3d at 835 (emphasis added).  However, a person or

company "cannot be convicted merely because [he] hoped or expected or believed that referrals

may ensue from remuneration that was designed wholly for other purposes."  *Id.* at 834.  The

6

factfinder must make the "difficult factual determination" of a payor-company's intent in paying or offering remuneration to a healthcare provider:  that is, is the prospect of inducing Medicare-funded patient referrals the "motivating factor" for the remunerative relationship, or is it simply a "collateral hope or expectation"?  *Id.* at 834 n.7.  The former would subject the payor-company to liability under the AKS, while the latter would not.

The practice of waiving copays, or making donations to offset the cost of copays, may violate the AKS.  Copay discounts or waivers made directly to patients certainly implicate the AKS.  The Seventh Circuit has found that a pharmacy's practice of forgiving the copays of Medicare customers, and providing them small gifts (such as tins of caviar), in order to induce them to fill their prescriptions there, rather than at competitor pharmacies, was a "kickback" under the AKS:

> The fraudulent character of giving discounts or refunds to the pharmacy's customers is less obvious—what is wrong with offering an inducement that reduces a product's cost to the consumer?  The answer is that a discount or refund can become a "kickback" . . . because it artificially inflates the price that the government pays pharmacies for prescription drugs for Medicare or Medicaid beneficiaries . . . The [discount or] refund to the customer would thus have been a "kickback" . . . because it would have increased the pharmacy's sales (and presumably its profits, as otherwise it wouldn't provide refunds) at the government's expense.  It would have had done so either by diverting customers from other pharmacies or by inducing customers to purchase drugs that they would not have been willing to purchase had they been responsible for the copay.

*United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1104-05 (7th Cir. 2014).

Similarly, improperly structured donations to copay-assistance charities may violate the AKS if they are made with the intent to induce Medicare-funded referrals or drug purchases.  *See, e.g.*, *United States v. Teva Pharms. USA, Inc.*, 2023 WL 4565105 (D. Mass. July 14, 2023).

In 2005, the Office of the Inspector General for the Department of Health and Human Services ("HHS-OIG"), the agency that administers Medicare, issued a "special advisory

bulletin" addressing how companies may contribute to copay-assistance programs without violating the AKS and FCA.  *See* HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005).[1]  The 2005 bulletin advises that "pharmaceutical manufacturers can donate to bona fide independent charity PAPs [patient assistance programs], provided appropriate safeguards exist."  *Id.* at 70625.  The bulletin contains an illustrative list of such safeguards, stating that a pharmaceutical company's donations to an independent copay-assistance charity "should raise few, if any, anti-kickback statute concerns," as long as:

> (i) Neither the pharmaceutical manufacturer nor any affiliate . . . exerts any direct or indirect influence or control over the charity or the subsidy program;
>
> (ii) The charity awards assistance in a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary (*i.e.*, the assistance provided to the beneficiary cannot be attributed to the donating pharmaceutical manufacturer);
>
> (iii) The charity awards assistance without regard to the pharmaceutical manufacturer's interests and without regard to the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;
>
> (iv) The charity provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and
>
> (v) The pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.

*Id.* at 70626.  It adds in a footnote to section (v):

> We have previously approved a bona fide independent charity PAP arrangement that included only limited reporting of *aggregate* data to donors in the form of monthly or less frequent reports containing *aggregate* data about the number of all applicants for assistance in a disease category and the number of patients qualifying for assistance in that disease category . . . Reporting of data that is not

---

[1] While the bulletin is directed to enrollees of Medicare Part D, the guidance (how to contribute to copay-assistance foundations without violating the AKS and FCA) is applicable to both Parts B and D.

> in the aggregate or that is patient specific would be problematic, as would
> reporting of any data, whether or not in the aggregate, related to the identity,
> amount, or nature of subsidized drugs.

*Id.* at 70626 n.16.  The bulletin summarizes these safeguards by stating the operative rule or criteria for evaluating the legality of donations to PAPs as follows:  "Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices."  *Id.* at 70627.

   As set forth below, here the government has proffered sufficient facts to withstand a motion for summary judgment as to whether Regeneron violated the AKS.

### a.   Remuneration

   The first issue is whether the donations by Regeneron to CDF qualify as "remuneration" under the AKS.  Regeneron asserts that it had no control over which AMD treatments or patients CDF assisted, and that its donations therefore do not fall within the statutory prohibition.  As noted, however, "the AKS prohibits even the indirect receipt of prohibited remuneration." *United States ex rel. Banigan v. Organon USA Inc.*, 2016 WL 10704126, at *3 n.8 (D. Mass. Aug. 23, 2016).  Here, there is evidence that the promise of copay assistance through CDF indirectly provided remuneration to the physicians prescribing Eylea.  Remuneration means "anything of value"; the copay assistance eliminates the financial risk to physicians if they prescribed a drug for which patients cannot pay.  (*See, e.g.*, Docket No. 247, Ex. 52 ("Miller Decl.") ¶ 4 ("I have to be cognizant of the costs of these drugs; I cannot take on the cost of patient balances myself."); *id.* at ¶ 5 ("[T]he availability of copay assistance often gives me the option to administer Eylea if Eylea is the wet AMD drug that I prefer for a given patient.")).[2]

---

[2] This definition of "remuneration" derives from a 1994 HHS-OIG bulletin:  "In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute.  42 U.S.C. 1320a-7b(b).  The statute makes it illegal to offer, pay,

Under the circumstances, there is sufficient evidence that the government can prove that the donations constituted "remuneration" within the meaning of the AKS.[3]

### b. Inducement of Claims

The second issue is whether the donations constituted an "inducement" to purchase an item within the meaning of the AKS. Regeneron asserts that the structure of CDF made it impossible for the donations to "improperly influence" or "impermissibly influence" doctors' and patients' decision to purchase Eylea. *See Guilfoile*, 913 F.3d at 192-93; 70 Fed. Reg. 70627. For example, it contends that CDF allocated its AMD grants to patients on a first-come, first-served basis, and that physicians therefore had no way of knowing whether a patient would eventually receive copay assistance from CDF when they made their prescribing decisions.

However, the record contains evidence suggesting that at least some doctors did know about the availability of copay assistance before administering Eylea, and that the expectation of copay assistance did, in fact, change their behavior. (*See, e.g.*, Docket No. 247, Ex. 47 ("Sarrafizadeh Decl.") ¶ 4 ("Co-pay assistance for Medicare patients is a huge help in removing financial considerations from treatment decisions. Many Medicare patients with concerns about the high cost of co-pays can get branded wet AMD treatment like Eylea because of foundation payments. I am able to prescribe whichever drug I would like to my Medicare patients because I know the co-pay foundation will cover or significantly reduce their co-pays for branded drugs.");

---

solicit or receive *anything of value* as an inducement to generate business payable by Medicare or Medicaid." HHS-OIG, Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65375 (Dec. 19, 1994) (emphasis added).

[3] There is sufficient evidence that the government can prove that the donations constituted "remuneration" within the meaning of the AKS even under the Sixth Circuit's interpretation of the term in *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043 (6th Cir. 2023). The court in *Martin* considered whether renumeration "covers just payments and other transfers of value or any act that may be valuable to another." *Id.* at 1048. The court held that the term "renumeration" is limited to "payments and other transfers of value," reasoning that a broader definition both contravenes the "four corners of the statute" and "lacks a coherent end point." *Id*. at 1048, 1050-52. In reaching that conclusion, the court found that a hospital's decision not to hire a particular doctor did not amount to an "offer of referrals" to another doctor. *Id*. at 1052.

Docket No. 247, Ex. 48 ("Siegel Decl.") ¶ 4 (discussing the availability of copay assistance from CDF for "many of [her] patients"); Docket No. 247, Ex. 49 ("Khan Decl.") ¶ 5 ("I typically have freedom of choice when prescribing wet AMD drugs to Medicare Part B patients because I know the patients will be able to afford the drugs once they receive copay assistance."); Docket No. 275, Ex. 72 ("Subramanian Decl.") ¶¶ 4-5 ("Cost is a consideration for me when recommending treatment.  I will not administer Eylea unless the patient's insurance will cover it or the patient receives assistance or wants to pay out of pocket . . . Copay assistance or full payment assistance is usually available for my patients.  My understanding is that this assistance comes from Regeneron.")).

Accordingly, there is sufficient evidence that the remuneration structure "influence[d] decisions on the provision of health care," *Guilfoile*, 913 F.3d at 193, and thus induced Medicare claims for Eylea.

### c.     Intent to Induce Claims

The third question is whether there is evidence that Regeneron had the necessary intent to induce purchases of Eylea.  The government has submitted evidence that at least some Regeneron employees understood that they were receiving Eylea-specific data from CDF, used CDF-provided data to perform ROI calculations that affected the amount of Regeneron's contributions to CDF, and sought to conceal their use of such data from internal auditors.

For example, William Daniels, who testified that he "was Regeneron's main point of contact to co-pay assistance foundations and managed the relationship between Regeneron and those foundations," stated that he "had been receiving data from CDF that was specific to Eylea" and that he used CDF data to perform ROI calculations.  (Docket No. 275, Ex. 3 ("Daniels Dep. Tr.") 11:22-24, 97:5-6).  In addition, there is evidence that Bob Terifay, Regeneron's former Vice President of Commercial, changed an email from Daniels before forwarding it to the

internal audit team (a change that the government contends was made in order to conceal from internal auditors that Regeneron possessed Eylea-specific data from CDF).  (*See* Docket No. 315, Ex. 1).

That evidence could support an inference that Regeneron intended to use CDF as a conduit to reimburse patients and influence the choices of physicians, and therefore had more than a vague "hope or expectation" that Eylea purchases would increase following donations to CDF.  *See McClatchey*, 217 F.3d at 834 n.7.[4]  Ultimately, intent is a "difficult factual determination" that should be left for a jury to decide, rather than the court at the summary-judgment stage.  *See id.*

In summary, viewing the entire record in the light most favorable to the government and drawing all reasonable inferences in its favor, there is evidence that Regeneron paid remuneration, through donations to CDF, in order to induce physicians to recommend Medicare-subsidized purchases of its drugs and to induce patients to purchase those drugs.  Accordingly, summary judgment will not be granted on the basis that there is insufficient evidence to establish a violation of the AKS.

## 2.  <u>Whether the Government Can Show that Regeneron's Donations Resulted in False Claims</u>

As noted, any claim for Medicare reimbursement "that includes items or services *resulting from* a violation of [the AKS] constitutes a false or fraudulent claim for purposes of

---

[4] Nor can Regeneron establish at this stage that its intent was categorically proper based on the "safe harbor" described in the 2005 HHS-OIG guidance.  Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623.  The government has proffered some evidence (which Regeneron challenges) that Regeneron's combined donations to CDF in 2013 and 2014 closely tracked the AMD fund's total Eylea assistance during that period, which, in turn, could permit an inference that CDF unlawfully "function[ed] as a conduit for payments by the pharmaceutical manufacturer to patients." *Id.* at 70627.

In addition, given evidence that "[p]atients granted copay assistance for a calendar year did not necessarily receive copay assistance during that year," at this stage, the Court declines to compare the amount of its donations and CDF's assistance only on an annual basis.  (*See* Docket No. 247, Ex. 22 ("Resnick Report") at 8 ¶ 19).

[the FCA]."  42 U.S.C. § 1320a-7b(g) (emphasis added).  In other words, an "AKS violation that results in a federal health care payment is a per se false claim under the FCA."  *Guilfoile*, 913 F.3d at 190 (citing *Lutz*, 853 F.3d at 135).

The meaning of the term "resulting from" is not settled, and has led to differing interpretations.  *See United States ex rel. Fitzer v. Allergan, Inc.*, 2022 WL 846211 at *9 (D. Md. Mar. 22, 2022) ("Courts around the country have struggled to define the standard of causation that is required to prove an FCA claim based on an AKS violation.").  At a minimum, the language clearly suggests that there must be a causal relationship of *some* kind between the AKS violation and the medical decision that resulted in the false claim.  To date, the only pronouncement by the First Circuit on the question has been in *Guilfoile*:  "[I]f there is a sufficient causal connection between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA."  *Guilfoile*, 913 F.3d at 190 (citing *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96-98 (3d Cir. 2018)).

The precise requirements of that "sufficient causal connection" are unclear.  Among the principal unsettled questions are (1) the legal standard (but-for causation, or some other, less demanding, standard); (2) the nature and amount of the evidence that the government must present to prove the causal connection; and (3) the extent to which the defendant can offer countervailing evidence of a lack of causation.

Before turning to an analysis of the caselaw, there are two threshold questions.  The first is whether the Third Circuit's decision in *Greenfield* is effectively binding on this Court.  According to the government, it is, because the First Circuit cited that decision in *Guilfoile* for the proposition that there must be "a sufficient causal connection" between the violation and the

submitted claim.  *Id.*  It is true that the court in *Guilfoile* cited—although it did not discuss—

*Greenfield*.  But the court expressly disclaimed making a decision on the "full implications" of

the statute, and did not elaborate on what it meant by a "sufficient causal connection."  *Id.* [5]  The

court explained that engaging in such an analysis would be superfluous, as the issue facing the

court was "not the standard for proving an FCA violation based on the AKS, but rather the

requirements for pleading an FCA retaliation claim."  *Id.* [6]  Under the circumstances, this Court

does not find *Greenfield*, or the causation standard set forth in that opinion, to be binding. [7]

The second question is whether this Court is bound by its own earlier decision in this

case, issued December 4, 2020, denying Regeneron's motion to dismiss.  Again, the answer to

that question is no.  That opinion did address the issue of causation, but at a relatively superficial

level; moreover, that discussion was not informed by the opinion of the Eighth Circuit in *United*

*States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828 (8th Cir. 2022), and the Sixth Circuit in in

*United States ex rel. Martin v. Hathaway*, 63 F.4th 1043 (6th Cir. 2023), neither of which had yet

been issued.  *United States v. Regeneron Pharms., Inc.*, 2020 WL 7130004, at *14-15 (D. Mass.

Dec. 4, 2020).  Furthermore, and in any event, that decision was an interlocutory order, which is

subject to reconsideration at any point. [8]  This Court will therefore consider the causation issue

---

[5] The *Guilfoile* court noted:  "We have previously declined to directly address the impact of § 1320a-7b(g) on FCA actions, *see Hutcheson*, 647 F.3d at 379 n.1, and we do not attempt to assess the full implications of the AKS provision today."  *Guilfoile*, 880 F.3d at 190.

[6] That distinction is potentially significant, because pleading a retaliation claim under the FCA "does not require adequately pleading the submission of a false claim or meeting the Rule 9(b) standards for pleading fraud." *Guilfoile*, 880 F.3d at 189.  Plaintiffs who allege retaliation must only "plausibly plead a reasonable amount of smoke — conduct that could reasonably lead to an FCA action based on the submission of a false claim."  *Id.*

[7] At least two other courts in this district, however, have concluded that *Guilfoile* counsels following *Greenfield*.  *See Teva*, 2023 WL 4565105, at *5 (D. Mass. July 14, 2023) (quoting *United States ex rel. Bawduniak v. Biogen Idec Inc.*, 2022 WL 2438971, at *2 (D. Mass. July 5, 2022)).  The *Bawduniak* court, however, acknowledged that the "First Circuit's analysis may not be binding."  *Bawduniak*, 2022 WL 2438971, at *2.

[8] The doctrine of law of the case is not implicated, because '[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case.'"  *Harlow v.*

anew, without being bound by its prior ruling.

To date, there are three circuit opinions directly addressing the meaning of the term "resulting from a violation."  *See Greenfield*, 880 F.3d at 96-100; *Cairns*, 42 F.4th at 834-37; *Martin*, 63 F.4th at 1052-55.  As set forth below, those three opinions adopt two different approaches.

In *Greenfield*, 880 F.3d 89, the Third Circuit rejected a standard that would require proof "that federal beneficiaries would not have used the relevant services absent the alleged kickback scheme."  *Id.* at 100.  The court did not perform a textual analysis of the term "resulting from," or consider how that phrase had been interpreted in other contexts.  Instead, it concluded that a requirement of but-for causation "would dilute the False Claims Act's requirements vis-à-vis the Anti-Kickback Statute, as direct causation would be a precondition to bringing a False Claims Act case but not an Anti-Kickback Statute case."  *Id.* at 97.  It further reasoned that such a standard would be inconsistent with the intentions of the drafters of the AKS, who sought "to strengthen the capability of the Government to detect, prosecute, and punish fraudulent activities under the [M]edicare and [M]edicaid programs."  *Id.* at 96 (quoting H.R. Rep. No. 95-393, at 1 (1977)).  As a result, it concluded that the legislative history suggests that a but-for causation standard was not required.  *Id*. at 96-98.

Instead, the *Greenfield* court determined that the phrase "resulting from" requires the plaintiff (there, a relator) to prove only "a *link* between the alleged kickbacks and the medical care received."  *Id.* at 100 (emphasis added).  Such a plaintiff need not "show that a kickback

---

*Children's Hosp.*, 432 F.3d 50, 55 (1st Cir. 2005) (quoting *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)); *see also Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas*, 982 F.3d 20, 26 (1st Cir. 2020) ("[T]he Civil Rules authorize district courts to revise their own orders and decisions at any time before entering final judgment." (citing Fed. R. Civ. P. 54(b))).

directly influenced a patient's decision to use a particular medical provider," but must demonstrate "some connection between a kickback and a subsequent reimbursement claim." *Id.* at 97, 100.[9]  The court expressly rejected the "taint" theory proposed by the relator, stating that "the taint of a kickback" does not "render[] every reimbursement claim false." *Id.* at 100. Instead, it concluded that a kickback will not "morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." *Id.*[10]

In *Cairns*, 42 F.4th 828, the Eighth Circuit declined to follow *Greenfield*, and instead held that "when a plaintiff seeks to establish falsity or fraud through the 2010 amendment, it must prove that a defendant would not have included particular 'items or services' but for the illegal kickbacks." *Id.* at 836.

The court approached the issue as one of statutory interpretation.  It began by observing that "[w]hen a statute is unambiguous, interpretation both begins and ends with the text." *Id.* at 834 (citing *Food Mktg. Inst. v. Argus Leader Media*, 139 S.Ct. 2356 (2019)).  It then noted that the Supreme Court had interpreted "a nearly identical phrase, 'results from,' in the Controlled Substances Act" in *Burrage v. United States*, 571 U.S. 204 (2014). *Id.*  There, the Supreme Court interpreted the phrase "results from" in that Act to require but-for causation. *See Burrage*, 571 U.S. at 212 ("Where there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality.").  Because that but-for

---

[9] The court concluded that establishing "temporal proximity" between the kickbacks and the submission of claims, without more, is not enough. *Id.* at 100.

[10] Although as yet there are no other circuit opinions following *Greenfield*, the opinion has been followed by other district courts outside of Massachusetts. *See, e.g., United States v. Teva Pharms. USA, Inc.*, 2019 WL 13244248, at *2-3 (S.D.N.Y. Apr. 11, 2019); *Fitzer*, 2022 WL 846211 at *9; *Kuzma v. N. Arizona Healthcare Corp.*, 2022 WL 2159027, at *10 (D. Ariz. June 15, 2022); *United States ex. rel. Wallace v. Exactech, Inc.*, 2020 WL 4500493, at *19 (N.D. Ala. Aug. 5, 2020).

causation standard is the "default" or "background" rule against which Congress legislates, and

because there are no textual indications to the contrary in the 2010 amendments, the court

declined to consider legislative history and the drafters' purported intentions.  *Cairns*, 42 F.4th at

835-36.

Like the *Greenfield* court, the *Cairns* court expressly rejected the "taint" theory proposed

by the government.  *Id.* at 835.  The government had argued that "all that is required is that the

illegal kickbacks 'tainted' the 'claim[] for goods or services' or the anti-kickback 'violation itself

*may* have been a contributing factor.'"  *Id.*  The court observed:

> These alternative standards, however, are hardly causal at all.  A 'taint' could
> occur without the illegal kickbacks motivating the inclusion of *any* of the 'items
> or services.'  Similarly, asking the jury if a violation '*may* have been a
> contributing factor' does not establish anything more than a mere possibility.

*Id.*  It further observed that as a matter of statutory construction, the phrase "resulting from" is

"unambiguously causal," and therefore it was unnecessary to substitute a different causal

standard when Congress itself had not done so.  *Id.* at 836.  It noted that if Congress intended to

codify an expanded understanding of AKS enforcement in the 2010 amendments, "it could have

selected different language."  *Id.*

Most recently, in *Martin*, 63 F.4th 1043, the Sixth Circuit followed *Cairns* and adopted a

but-for causation standard, reasoning that "[w]here a statute 'yields a clear answer, judges must

stop.'"  *Id.* at 1053 (quoting *Argus Leader Media*, 139 S.Ct. 2356, 2364 (2019)).  The court noted

that "[t]he ordinary meaning of 'resulting from' is but-for causation," and legislative history does

not "overcome the ordinary meaning of the text."  *Id.* at 1052-53.  In addition, it observed that

"we generally do not consider legislative history in construing a statute with criminal

applications, the idea being that no one should be imprisoned based on a document or statement

that never received the full support of Congress and was presented to the president for

signature." *Id.* at 1054.[11]  And it cautioned that "reading causation too loosely" would mean that "[m]uch of the workaday practice of medicine might fall within an expansive interpretation of the Anti-Kickback Statute." *Id.* at 1054.  A looser theory of causation would fail to "protect doctors of good intent, sweeping in the vice-ridden and virtuous alike." *Id.*  A standard of but-for causation, on the other hand, "still leaves plenty of room to target genuine corruption." *Id.* at 1055.  Accordingly, the court granted a motion to dismiss where there was "not one claim for reimbursement identified with particularity in this case that would not have occurred anyway." *Id.* at 1053.  ("[T]he alleged scheme did not change anything.").

Here, the government acknowledges that it has the burden of proving some form of causal connection.  In substance, it contends that the "exposure" theory set forth in *Greenfield* is correct:  that is, once it has proved that an AKS violation occurred, all that is required to prove a causal link is that "a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." *Greenfield*, 880 F.3d at 100.  According to the government, proof of but-for causation is not required, and evidence that a kickback actually influenced (or did not influence) a physician's medical judgment is irrelevant.  Regeneron, in turn, contends in substance that a "but-for" causation standard should apply, and that the government bears the burden of proving that an AKS violation occurred and that the remuneration actually caused the physician to provide different medical treatment (and thus caused the false claims).

---

[11] In a discussion earlier in the opinion concerning the term "remuneration," the *Martin* court observed:

Recall that the same language creates civil *and* criminal liability.  In the context of dual-application statutes like this one, we give the same interpretation to the same words, whether applied in a civil or criminal setting.  That means that, if ambiguity exists over the meaning of a provision, the rule of lenity favors a narrower definition.

63 F.4th at 1050.

In the court's view, the standard set forth in *Greenfield* is fraught with problems.  To begin, and as the *Cairns* and *Martin* courts observed, that standard is divorced from the actual language of the statute and from basic principles of statutory interpretation.  It is likewise disconnected from long-standing common-law principles of causation.[12]  As a result, and because the standard uses a term ("exposed") that is not set forth in the statute and is not part of a familiar common-law framework, its meaning is unclear and its application in specific factual contexts is uncertain.  A simple hypothetical will help to illustrate the point.

Suppose a doctor has two options for treating a patient with a particular condition: product A or product B.  Each year for several years, she writes 50 prescriptions for A and 50 for B.  One year, she receives unlawful remuneration from the manufacturer of A, and her prescriptions that year rise to 75 for A and drop to 25 for B.  If permitted (and, presumably, immunized), she would testify that based on her medical judgment, and in the absence of any remuneration, that year she would have written 65 for A and 35 for B.  All the prescriptions resulted in Medicare claims.

How many false claims "result[ed] from" that AKS violation?  If the standard is but-for causation, and the doctor's testimony is both permitted and credited, the answer is likely 10 (75

---

[12] In *Universal Health Services v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016), the Supreme Court held that a theory of implied false certification could provide a basis for liability under the FCA.  In doing so, the Court examined the principles of common-law fraud.  It wrote:

> Congress did not define what makes a claim "false" or "fraudulent."  But it is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.  And the term "fraudulent" is a paradigmatic example of a statutory term that incorporates the common-law meaning of fraud.

*Escobar*, 579 U.S. 176, at 187 (citation omitted).

The Seventh Circuit in *United States v. Luce* drew upon that reasoning to find that "nothing in the FCA contains any indication of an intent to depart from the common-law understanding of causation in fraud cases." *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017).  While *Luce* does not concern the language from the AKS at issue in this case, the opinion highlights the principle that Congress is presumed to incorporate well-settled judicial interpretations of terms when it enacts legislation.

minus 65).  If the standard is but-for causation, and the doctor's testimony is not permitted or not credited, the answer is likely 25 (75 minus 50).  If the standard is "taint" (that is, once the government has proved that the unlawful remuneration occurred, all of the prescriptions written by the doctor for A must be deemed to have resulted in false claims), the answer is 75.[13]

But what if the standard is "exposure"?  Again, the *Greenfield* court expressly rejected both a but-for causation standard, 880 F.3d at 96, and a "taint" standard, *id*. at 100.  In the hypothetical, what is the number of claims in which patients were "exposed" to an AKS violation?  If the answer is 75, what is the difference between the rejected "taint" standard and the permitted "exposure" standard?  If the answer is more or less than 75, what is the analytic process that leads to that result?

The *Greenfield* opinion also effectively bars the defendant from contesting the government's evidence of causation once an AKS violation is proved.  As noted, the court concluded that because the government need only prove a "link" between the violation and the claim (which, again, it defined as an "exposure'), it is not necessary for the government to prove actual causation—that is, that the AKS violation actually caused the provision of the medical services that led to the false claim.  *Id*. at 98, 100.

Following *Greenfield*, another judge in this district described the standard as follows:

> [A] claim is false if it seeks reimbursement for a prescription that was not provided in compliance with the Anti-Kickback Statute, regardless of whether the claim was the result of a *quid-pro-quo* exchange or would have been submitted even absent the kickback.  *See Greenfield*, 880 F.3d at 96.  Relators need not show that a *quid pro quo* exchange occurred, or that the physicians would not have prescribed Defendant's medication but for the kickbacks.  It is sufficient to show that Defendant paid kickbacks to a physician for the purpose of inducing the

---

[13] Of course, the matter becomes considerably more complicated once other variables are introduced, such as multiple physicians and multiple patients with differing medical circumstances.  The matching of the remuneration from the manufacturer to the physician may also be quite difficult, particularly where (as here) the alleged remuneration was indirect, more than one manufacturer is potentially involved, and there are temporal and other variables that make one-to-one tracing challenging as an evidentiary matter.

> physician to prescribe specific drugs, and that the physician then prescribed those drugs, even if the physician would have prescribed those drugs absent the kickback.

*United States ex rel. Bawduniak v. Biogen Idec, Inc.*, 2018 WL 1996829, at *3 (D. Mass. Apr. 27, 2018).  Thus, under *Greenfield*, it is "sufficient" for the government to prove that a kickback was paid to a physician and the physician then prescribed the product.

*Greenfield*, however, went further, and concluded that the intent of the prescribing physician and the treated patient are necessarily irrelevant.  880 F.3d at 98.  It is by no means obvious that such an approach is correct.  The Court need not decide that issue for purposes of the present motion; nonetheless, it is reasonable to ask why the defendant could never be permitted to put on any evidence, from any source, suggesting that a particular referral or treatment was not actually caused by the AKS violation.  Indeed, if that is correct, an AKS violation could lead to liability even if all of the prescribing physicians were unaware of the violation, and even if the violation did not cause a single additional referral or prescription.  If nothing else, it is unclear how such an inducement "resulted in" any false claims.  Proof of a "link" thus becomes akin to an irrebuttable presumption:  it leads to liability even if the facts show no actual causation of any kind.[14]

In any event, in the Court's view, the statutory construction analysis set forth in *Cairns* and *Martin* is persuasive.  The adoption by Congress of the "resulting from" language in the statute requires a finding that the appropriate standard is but-for causation, and the Court will follow that approach here.

---

[14] As this Court noted in *United States ex rel. Flanagan v. Fresenius Med. Care Holdings, Inc.*, another possible approach might be to adopt a burden-shifting framework; once the government has proved a *prima facie* case of causation, the burden would shift to the defendant to prove the contrary.  *Flanagan*, 2022 WL 17417577, at *18 (D. Mass. Dec. 5, 2022).

It does not necessarily follow, however, that the government's burden is thereby made insuperably difficult.  To begin, under tort law, but-for causation does not normally require that an actor be the sole factual cause of a harm.  *See, e.g., Bostock v. Clayton County*, 140 S.Ct. 1731, 1739 (2020) ("[O]ften, events have multiple but-for causes.").  Under traditional principles, a negligent act will satisfy the but-for causation requirement if it was a "substantial factor in bringing about" the harm.  *Bernier v. Boston Edison Co.*, 380 Mass. 372, 386 (1980); *see Tritsch v. Boston Edison Co.*, 363 Mass. 179, 182 (1973); *Falvey v. Hamelburg*, 347 Mass. 430, 435 (1964).[15]  It is thus likely that the government will not need to prove that the AKS violation was the only cause of the resulting false claim.

As to the quantum of evidence necessary to prove a violation, the government is not required in a civil case to adduce proof beyond a reasonable doubt.  Under a preponderance standard, it need only prove that it was more likely than not that the AKS violation was the cause of the false claim.  And the government, like any litigant, is entitled to attempt to prove its case through circumstantial evidence and reasonable inferences.  It cannot do so through speculation or conjecture (for example, by arguing that there "must have been" a false claim resulting from the AKS violation), but its proof need not be beyond all possible doubt.  And the Court sees no reason why its evidence may not, in the right circumstances, include proof of temporal proximity—although, as in any case where causation is proved in that manner, it may not be sufficient, and the reasonableness of the inference may be attenuated as the time period grows longer.  *See Greenfield*, 880 F.3d at 100 (stating that proof of temporal proximity is not enough

---

[15] The Supreme Judicial Court has recently criticized the term "substantial contributing cause," calling it "confusing" and identifying the standard "proposed in the Restatement (Third) for multiple sufficient cause cases" as a more favorable alternative.  *Doull v. Foster*, 487 Mass. 1, 17-18 (2021).  Nevertheless, it remains true that there can be "multiple, simultaneously operating, sufficient causes" of a harm.  *Id.* at 18.

to show the requisite "link"); *Martin,* 63 F.4th at 1053 (stating that "[t]emporal proximity by itself does not show causation, and seven months would create few inferences of cause and effect anyway.").

With that framework in mind, the question then becomes whether the government here has proffered sufficient evidence to establish but-for causation.  The government has submitted a report from Ian Dew, who analyzed CDF disbursement data in conjunction with Medicare claims data and performed a "matching" analysis identifying Medicare claims for which CDF paid some or all of the beneficiary's copay.  (*See* Gov't's SUF ¶¶ 20-21).[16]  In order to perform that analysis, Dew "filtered the Medicare claims to include only those that list a Wet AMD diagnosis code" and "filtered the CDF disbursements to include only those disbursements from CDF's Wet AMD fund."  (*Id.*, Ex. 10 at 1).  He found that "115,192 Medicare claims in 2013 and 2014 had part or all of the beneficiary copayment covered by one or more CDF disbursements, and these claims resulted in reimbursements of $68,029,431 to providers."  (*Id.* at 7).

In addition, the government points to other evidence that physicians would not have submitted claims for Eylea absent the co-pay subsidies.  The price of Avastin, an alternative therapy, was dramatically lower than the price of Eylea, and it is surely true that physicians and patients alike would take the out-of-pocket cost of a drug into account when making medical decisions.  That would be particularly likely here, where Eylea was a buy-and-bill drug that would leave the physician's practice bearing the cost of any unpaid copay obligations.

Regeneron contends that Dew's analysis cannot prove a causal "link" between *its* donations and Medicare claims, because he only "matched" disbursements from *CDF* to Eylea

---

[16] Regeneron disputes that Dew accurately analyzed that data and determined the Medicare claims for which CDF paid some or all of the beneficiary's copays.

patients.  He did so, it asserts, despite evidence that CDF had multiple donors and a surplus of

funds from another donor at that time.  Thus, according to Regeneron, his analysis proves

nothing more than "temporal proximity" between the donations and the Medicare claims, which

*Greenfield* concluded was insufficient to establish causation.  *See* 880 F.3d at 100.[17]

A similar argument, however, was rejected by another court in this district.  *See United*

*States v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412, 422 (D. Mass. 2021) ("Teva's assertion

that the government cannot link its donations to specific false claims because other donors

contributed to the relevant MS funds is unpersuasive."); *see Teva*, 2023 WL 4565105, at *3 (D.

Mass. July 14, 2023) (considering matched-claims analysis of Ian Dew in rejecting defendant's

motion for summary judgment as to causation under the FCA).

The government also contends that Regeneron's claim of a "surplus" is "misleading" as

to 2013 and "grossly deceptive" as to 2014; among other things, it notes that Regeneron's expert

witness improperly used an end-of-year figure for 2013 of $33 million and a beginning-of-year

figure for 2014 of $65 million, even though the two figures should have been identical.  (Gov't

Opp. at 25-26).

Based on the record before the Court, it cannot conclude that the government's evidence,

including Dew's analysis, is so flawed or incomplete as to every alleged false claim that

judgment must necessarily enter for Regeneron.  Resolving all doubts in favor of the government

as the non-moving party, and construing the evidence in the light most favorable to it, the factual

---

[17] Regeneron further contends that because Dew testified that he was not expressing an opinion on causation, his analysis cannot establish a causal link.  (*See* Docket No. 261, Ex. 4 ("Dew Dep. Tr.") 78:12-21).  Because an expert's role is to provide opinions on evidence—not on legal concepts such as causation under the AKS and FCA—his testimony does not change the Court's conclusion.

evidence is sufficient to withstand summary judgment on the issue of causation.  *See O'Connor*,

994 F.2d at 907.

### 3.   <u>Whether Regeneron Lacked the Requisite Scienter Under the FCA</u>

Regeneron next contends that the government cannot establish a knowing violation of the

FCA because it lacks evidence that the relevant decisionmaker at Regeneron—the CEO, Dr.

Schleifer—"knowingly" caused the submission of false claims.[18]

As a general matter, a corporation is bound by the acts of its employees acting within the

scope of their employment.  *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st

Cir. 1987).[19]  That principle applies to claims arising under the AKS and the FCA.  *See United

States v. O'Connell*, 890 F.2d 563, 568 (1st Cir. 1989) (explaining that the FCA does not

"contain[] language that would preclude, or has a purpose that would not be served by, applying

vicarious liability").  Thus, the relevant scienter is not limited to that of the CEO (who, of course,

may well have been deceived by his employees); if a single employee of Regeneron had the

requisite knowledge and intent, that is sufficient.[20]

---

[18] To the extent Regeneron originally asserted that it lacked the requisite scienter because its conduct was consistent with an objectively reasonable interpretation of the law, that argument appears to have been foreclosed by the Supreme Court's recent decision in *United States ex rel. Schutte v. SuperValu Inc.*, 143 S.Ct. 1391 (2023) (holding that the FCA's scienter element refers to the defendant's knowledge and subjective beliefs, not what an objectively reasonable person might have known or believed).

[19] Under the "collective knowledge" doctrine, the "knowledge" attributable to a corporation is the sum of all of the knowledge possessed by all of its employees, regardless of their position.  *See Bank of New England*, 821 F.2d at 856.  For purposes of establishing scienter under the FCA, however, the "collective knowledge" doctrine does not apply.  *See, e.g.*, *Banigan*, 2016 WL 10704126, at *5 (D. Mass. Aug. 23, 2016) ("Courts within the First Circuit require at least one individual within a corporate entity to have acted knowingly . . . ."); *see also United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) ("[U]nder the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose.").

[20] To the extent the language in *United States ex rel. Dyer v. Raytheon Co.*, 2013 WL 5348571 (D. Mass. Sept. 23, 2013) could be read to suggest that ordinary principles of vicarious liability do not apply in FCA cases, the Court will decline to adopt that position.

Here, as noted, there is evidence that certain Regeneron employees believed that they were improperly receiving Eylea-specific data from CDF and sought to hide that information from internal auditors.[21]  That is evidence from which a reasonable inference could be drawn that those employees knew about the remuneration and understood that it was wrongful.  Accordingly, and under the circumstances, there is sufficient evidence to defeat summary judgment on the issue of scienter.

### 4.   Unjust Enrichment

Regeneron has also moved for summary judgment on the unjust-enrichment claim, contending that the government should be limited to the remedy Congress authorized in the FCA.  The Court agrees.

"[A] party with an adequate remedy at law cannot claim unjust enrichment."  *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017).  In addition, "[i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment."  *Id.*  Accordingly, courts in this district have routinely dismissed unjust-enrichment claims under similar facts to those presented here.  *See, e.g.*, *Teva*, 560 F. Supp. 3d at 423-24 (dismissing unjust-enrichment count "[b]ecause an adequate remedy at law exists in the government's FCA claims"); *United States ex rel. Martino-Fleming v. South Bay Mental Health Ctrs.*, 540 F. Supp. 3d 103, 133 (D. Mass. May 19, 2021) (same).  Accordingly, summary judgment will be granted as to the claim of unjust enrichment.

---

[21] Regeneron disputes that its employees were receiving Eylea-specific information from CDF.  However, the Court need not resolve that issue at this stage, because "[t]he FCA's scienter element refers to [defendant's] knowledge and subjective beliefs."  *SuperValu*, 143 S.Ct. at 1399; *see also id.* at 1400 ("[T]he FCA's standards focus primarily on what [defendant] thought and believed.").  As noted, the government has put forth evidence that at least some employees subjectively believed that they were receiving Eylea-specific data.

**C.       The Government's Motion for Partial Summary Judgment**

The government has moved for partial summary judgment on (1) the materiality of

violations of the AKS under the FCA; (2) the legal standard for FCA causation for claims

"resulting from" AKS violations; and (3) the minimum amount of damages that Regeneron owes,

should the government prove that it violated the FCA.

**1.       Materiality**

The government contends that healthcare claims that include items or services resulting

from kickbacks in violation of the AKS are *per se* materially false for purposes of the FCA.  The

Court agrees.

As noted, the 2010 amendment to the AKS clarified that any Medicare claim "that

includes items or services resulting from a violation of [the AKS] constitutes a false or

fraudulent claim for purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g); *see also Guilfoile*, 913

F.3d at 190 ("We further read the AKS amendment as obviating the need for a plaintiff to plead

materiality—that is, to plead that compliance with the AKS was material to the government's

decision to pay any specific claim.").  Accordingly, "a violation of the AKS is per se a violation

of the False Claims Act," and the government need not prove materiality.  *Bawduniak*, 2022 WL

2438971, at *1-2.

It does not follow, however, that summary judgment will be granted to the government as

to any claim asserted in the complaint.  The government must still prove that the AKS was

violated; the fact that its burden of proof is made easier by the 2010 amendment does not entitle

it, without more, to summary judgment.

**2.       Causation**

The government has moved for summary judgment on the issue of causation, contending

that it need only show under the *Greenfield* standard of "exposure" a "sufficient causal

connection" between Regeneron's contributions to CDF and the resulting copay-assisted Eylea claims that Medicare reimbursed.  For the reasons set forth above, the Court disagrees, and concludes that the government must prove but-for causation.  Accordingly, the government's motion for summary judgment as to causation will be denied.

### 3. Damages

Finally, the government contends that if it establishes at trial that Regeneron violated the FCA, the Court should award damages in the amount of at least $195,800,553—that is, the amount the government asserts is the trebled value of the claims it contends were tainted by improper copay assistance.[22]

As a general matter, courts do not entertain motions for partial summary judgment on damages where a party's liability has not yet been determined.  *See, e.g.*, *Marshall Contractors, Inc. v. Peerless Ins. Co.*, 827 F. Supp. 91, 93 (D.R.I. 1993) (finding that confronting damages questions on summary judgment before liability is established "may be a waste of judicial time"); *Boden v. St. Elizabeth Med. Ctr., Inc.*, 2018 WL 4855210, at *4 (E.D. Ky. Oct. 5, 2018) (denying motion as premature where movant attempted to "sidestep the crucial issue in this case" and place "the Court in the untenable position of being asked to render an advisory opinion on a hypothetical determination of critical facts"); *Robson v. Duckpond Ltd.*, 2021 WL 1222429, at *8 (E.D. Mo. Mar. 31, 2021) (holding that partial summary judgment on damages claims "would constitute an improper advisory opinion").[23]

---

[22] Dew calculated that Regeneron would be liable for at least $65,266,851 in single damages, which, if trebled, would amount to $195,800,553.  (*See* Gov't's SUF ¶ 26).

[23] Of course, motions for summary judgment as to damages are not barred in all circumstances.  *See, e.g.*, *Rudy v. City of Lowell*, 777 F. Supp. 2d 255, 259 (D. Mass. 2011); *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 8 (D. Mass. 2006).  However, in most cases where courts have granted such a motion, the parties did not "dispute the facts or the defendant's liability."  *See Rudy*, 777 F. Supp. 2d at 259; *see also City of New York v. Golden*

Although the critical questions in this case—whether Regeneron violated the AKS and caused the submission of false claims for payment to Medicare—remain undecided, the government has asked the Court to rule on the minimum amount of damages assuming, as a hypothetical, that the violations of the AKS and FCA are conclusively established.[24]  Although the Court acknowledges the benefits of resolving matters prior to trial, it is not convinced that judicial economy is served by ruling on hypothetical issues that may never have to be addressed. It will therefore deny the motion.

## IV.   Conclusion

For the foregoing reasons, the motion of the United States for partial summary judgment is DENIED, and the motion for summary judgment of defendant Regeneron Pharmaceuticals, Inc., is GRANTED as to the unjust-enrichment claim, and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  September 27, 2023

---

*Feather Smoke Shop, Inc.*, 2013 WL 3187049, at *33 (E.D.N.Y. June 20, 2013) ("A court may grant summary judgment as to damages *following a determination on liability . . . .*") (emphasis added)).

[24] This case is therefore unlike *Teva*, where the court granted summary judgment on the proper *standard* for measuring damages.  *See Teva*, 2023 WL 4565105, at *5-6 ("[T]he Court will measure damages in this case as the entirety of the government's payments for the claims resulting from the illegal kickbacks.").  As the government acknowledged at oral argument, it had not previously sought summary judgment on the legal standard for damages, but rather the minimum amount of damages.  (Docket No. 339 ("Hearing Tr.") at 78).